USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9-30-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

WAYNE SIGMON, Trustee in Bankruptcy :
for Karen LeBauer Hindin,
         *Plaintiff*,            :           12 Civ. 3367 (ALC) (GWG)

     -against-                     :           **ORDER AND OPINION**

GOLDMAN SACHS MORTGAGE COMPANY, :
MLQ DML HOTEL, L.L.C., MLQ DML SPA,
L.L.C. and MLQ DML RESTAURANT, L.L.C., :
         *Defendants.*

------------------------------------------------------------X

**ANDREW L. CARTER, JR., United States District Judge:**

    Defendants Goldman Sachs Mortgage ("Goldman Sachs") and MLQ DML Hotel, LLC, MLQ DML Spa LLC and MLQ DML Restaurant LLC (collectively, "MLQ Defendants" and together with Goldman Sachs, "Defendants") move to dismiss the Amended Complaint in its entirety. Wayne Sigmon, the Trustee ("Trustee") in the Chapter 7 bankruptcy of Karen LeBauer Hindin ("Hindin" or "Debtor") brings three claims of constructive fraudulent transfer under the laws of New York, Utah and North Carolina (Claims 1-3), N.Y. DCL § 270 et seq.; Utah Code 25-6-6; N.C.G.S. § 39-23.4. The Trustee also brings a claim to void an entire agreement that effectuated the underlying transfer because of an allegedly unlawful provision therein (Claim 4). For the reasons discussed below, Defendants' motion is granted in part and denied in part.

FACTUAL BACKGROUND

    Debtor's basis for claiming an interest is set forth as follows: On or about October 27, 2009, Debtor held a 50% interest in Dakota Mountain Lodge LLC ("Dakota"). Dakota in turn held a 50% interest in Duval Development Partners I Holdings ("DDP Holdings"), which held a 100% interest in Duval Development Partners I ("DDP"). In addition, Dakota held a 40%

1

interest in DML Holdings, another limited liability company, which held a 100% interest in Dakota Hotel Unit LLC ("Dakota Hotel") and Dakota Restaurant Unit LLC ("Dakota Restaurant").

Goldman Sachs acted as lender under the Loan Agreement, dated June 29, 2006, with DDP Holdings and DDP (the "Original Borrowers"). DDP was the record owner of at least a portion of a luxury hotel and spa property in Park City, Utah (the "Property") subject to a Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on or after June 29, 2006 (the "Deed of Trust"). On June 22, 2009, Dakota Hotel and Dakota Restaurant acquired the Property from DDP by quitclaim deed, at which point Dakota Hotel and Dakota Restaurant became New Borrowers also liable for the obligations of the Loan Agreement.

Hindin was both an equity holder and a guarantor for the financing of the project. She was a 50% interest holder in Dakota and ostensibly a 20% interest holder in DML Holdings by virtue of Dakota's 40% ownership of DML Holdings. She also signed personal guaranties to increased amounts of maximum indebtedness under the Deed of Trust and subsequent amendments to the Deed of Trust, guaranteeing the full amount of the Deed of Trust.

The transfer at issue here was effectuated by the Deed in Lieu of Foreclosure Agreement ("Deed in Lieu Agreement"), executed on October 27, 2009 (Am. Compl. Ex. H). In accordance with the Deed in Lieu Agreement and "at the direction of Goldman," DDP Holdings, DDP, Dakota Hotel, and Dakota Restaurant (collectively, the "Borrowers") conveyed the Property, including 100% interest in the Property, to the MLQ Defendants by special warranty deed (Am. Compl. ¶ 26).

The Deed in Lieu Agreement also included provisions that the loan exceeded the value of the Property but was not accompanied by an appraisal or valuation. (Am. Compl. ¶ 27). The Deed in Lieu Agreement stated a claimed indebtedness of $90,379,353.59, but the Trustee disputes the accuracy of this amount in the absence of a complete accounting. (Am. Compl. ¶ 34). The Deed in Lieu Agreement also included a provision of the Lender covenanting not to sue the Borrowers personally for any liability under the Loan Agreements and tentatively releasing Principals from their liabilities and obligations arising under the Guaranties, except for surviving liabilities, provided that an Interference Event did not occur within 91 days of the Transfer Date, i.e., the date of the Deed in Lieu Agreement. ("91 Day Clause") (Deed in Lieu Agreement § 5).

When the Deed in Lieu Agreement was executed, Hindin signed in her capacity as a guarantor, but she was also a signatory for two of the Borrowers (DDP Holdings and DDP) as a member of Dakota.[1] (See Am. Compl. Ex. H).

On April 28, 2010, Hindin filed her petition for Chapter 7 bankruptcy in the Western District of North Carolina.

## DISCUSSION

I. Motion to Dismiss

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a claim must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when

---

[1] Although Hindin alleges an indirect interest in DML Holdings, she did not sign on its behalf in the Deed in Lieu Agreement, possibly because she was not a named manager of DML Holdings.

3

the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

On a motion to dismiss, the court will accept the plaintiff's allegations as true, see Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007), and must "draw all reasonable inferences in favor of the plaintiff," id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)). However, the court need not accept allegations that are merely conclusions of law. Kassner, 496 F.3d at 237 (complaint inadequate if it "merely offers labels and conclusions or a formulaic recitation of the elements of a cause of action"). Therefore, on a motion to dismiss, "[t]he appropriate inquiry is not whether a plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims." Fernandez, 471 F.3d at 51 (internal quotation marks and citation omitted).

"In considering a motion to dismiss, the Court may consider documents attached as an exhibit thereto or incorporated by reference, documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken. Thomas v. Westchester County Health Care Corp., 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (internal citations omitted). To incorporate a document by reference, "the Complaint must make a clear, definite and substantial reference to the document[ ]." Id. at 275-76. Moreover, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce [the document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (on a motion to dismiss, a court may consider

4

"documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."). Notably, a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough. Chambers, 282 F.3d at 153.

Here, there is considerable reliance on documentation produced in the underlying bankruptcy proceeding, of which the court may take judicial notice.

II. Avoidance of Transfer under 11 U.S.C. § 544

The "strong arm" clause set forth in 11 U.S.C. § 544(a) "enables the trustee in bankruptcy to act as a hypothetical lien creditor as of the day the bankruptcy case is filed." In re Wlodarski, 115 B.R. 53, 58 (Bankr. S.D.N.Y. 1990) (citing In re Kors, Inc., 819 F.2d 19, 22 (2d Cir.1987) (citations omitted). In his capacity as a lien creditor, the trustee of a bankruptcy estate "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C.A. § 544(b)(1). But "[S]ection 544(b) does not purport to *ipso facto* render void any transactions between the debtor and others; it creates merely a *power of avoidance,* that may be exercised as the trustee and the bankruptcy court sees [sic] fit . . . . It is a provision which states that the trustee may avoid certain transfers of the debtor as a creditor might avoid them, thus plainly implying that, against the trustee as against the creditor, the transferee's title is not void, but voidable—voidable at law as well as in equity, but still only voidable." In re General

5

Highway Exp., Inc., 1990 WL 1129, at *3 (6th Cir. 1990) (quoting 4 Collier on Bankruptcy, § 544.03[1], p. 544–15 (15 ed. 1989) (emphasis in original) (internal quotation marks omitted).

The Trustee contends that the Debtor transferred property via the Deed in Lieu Agreement between the lender, Goldman Sachs, and borrower entities, in which Debtor had an equity interest. The Deed in Lieu Agreement is governed by New York law, see Deed in Lieu Agreement § 6.3, so the Court will apply New York law or New York choice-of-law rules.

III. Applicable State Law (Claims 1 and 3)

As an initial matter, the bankruptcy court's jurisdiction over property is limited to "property, wherever located, of the debtor as of the commencement of such case, and [ ] property of the estate." 28 U.S.C. § 1334(e)(1). Unless otherwise dictated by the bankruptcy code, property interests are determined by reference to state law. See Butner v. United States, 440 U.S. 48, 54-55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus, the Trustee can only assert his strong arm powers "using the substantive law of the state in which the property in question is located. . ." In re Reisner, 357 B.R. 206, 216 (Bankr. E.D.N.Y. 2006) (citing Midlantic Bank v. Bridge (In re Bridge), 18 F.3d 195, 200 (3d Cir. 1994)); In re Moreno, 293 B.R. 777, 782 (Bankr. D. Colo. 2003) ("The extent of the trustee's rights under 11 U.S.C. § 544 is measured by the substantive law of the jurisdiction governing the property in question."). Since the Property is located in Utah, the Trustee cannot use his strong-arm powers under Section 544 of the Bankruptcy Code to assert fraudulent transfer claims under New York or North Carolina law. Defendants' motion to dismiss the Trustee's claims under the New York Debtor and Creditor Law and North Carolina General Statutes (Claims 1 and 3) is granted.[2]

---

[2] The conclusion that Utah state law applies is the same under a choice-of-law analysis. See Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991) ("A fraudulent

IV. Utah Constructive Fraudulent Transfer under Utah Code §§ 25-6-5 and 25-6-6 (Claim 2)

The Amended Complaint refers (possibly erroneously) to Utah Code § 25-6-5.[3] (Am. Compl. ¶ 42). The Trustee does not allege any of the elements required under either provision of § 25-6-5 because he does not allege facts of actual intent of the Debtor to "hinder, delay, or defraud any creditor." See Utah Code § 25-6-5(a). Similarly, the Trustee does not allege that the Debtor was engaged or about to engage in a transaction. See Utah Code § 25-6-5(b)(i). To the contrary, the Deed in Lieu Agreement on which the Trustee bases his claim purports to end a business transaction, not begin a new one and the Trustee does not make any allegations at all about other transactions involving the Debtor. Neither does the Trustee allege facts that the Debtor intended to incur or should have believed she would incur new debts beyond his ability to

---

conveyance claim is governed by the law of the state in which the property is located."); Drenis v. Haligiannis, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) ("When the law is one which regulates conduct, such as fraudulent conveyance statutes, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.") (internal citations and quotation marks omitted).

[3] Section 25-6-5 of the Utah Uniform Fraudulent Transfer Act (UFTA) provides:
(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

pay or allege any such debts that were incurred, see Utah Code § 25-6-5(b)(ii). Therefore, I will only analyze the constructive fraudulent transfer claim under Utah Code § 25-6-6.

> Section 25-6-6 of the UFTA provides:
>
> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:
>
> (a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
>
> (b) the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation.
>
> (2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

Utah Code § 25-6-6.

While Defendants contend that Hindin must specify the property interest (Mot. at 12), it does not appear that this is a specific requirement to state a claim under Utah's constructive fraudulent transfer statutes. In re Holling, Bankruptcy No. 05–38322, 2007 WL 2964505, at *2 (Bankr. D. Utah Feb. 8, 2007) ("In order to succeed under Utah Code Ann. § 25–6–6(1) (under which the Trustee gains certain rights to sue by 11 U.S.C. § 544), the Trustee must demonstrate: (1) that a transfer was made; (2) that the debtor did not receive reasonably equivalent value; (3) that the debtor was insolvent at the time of the transfer; and (4) that at the time of the transfer there was a creditor whose claim arose before the transfer was made."); National Loan Investors, L.P. v. Givens, 952 P.2d 1067, 1070 (Utah 1998) ("To state a claim for relief, a plaintiff must allege that he or she is a creditor who has a right to payment from the defendant and that the defendant has made transfers of property or incurred obligations that meet the criteria of sections

25-6-5 and -6."). Furthermore, the Fraudulent Transfer Act is remedial in nature and should be liberally construed. Id. at 1069. Nevertheless, the Trustee does allege that the Debtor's "equitable interest in the Property" was transferred in the conveyances to the MLQ Defendants. (Am. Compl. ¶ 29). This is sufficient property interest under Utah law, which for the purposes of this provision, defines "property" as "anything that may be the subject of ownership." Utah Code § 25-6-2(10).

A. Transfer

The Trustee contends that property of the estate, the Debtor's equity interest in the Property, was transferred pursuant the Deed in Lieu Agreement, a contention that adequately alleges both a property interest and a transfer.[4] Notably, as a guarantor, the Debtor did not have an ownership interest in the Property. As an equity holder, however, the Debtor arguably held an interest in the property—whatever the value of equity in a bankrupt-remote special purpose entity is worth. So any transfer would have been pursuant to her role as an equity holder rather than a guarantor.

To the extent Defendants contend that Debtor is purporting to transfer corporate property to the bankruptcy estate, their reliance on In re Miner, 185 B.R. 362 (N.D. Fla. 1995) and In re Cassis, 220 B.R. 979, 983 (Bankr. N.D. Iowa 1998) is misplaced. Those cases present the scenario where a bankruptcy trustee attempted to claim the corporation's property as the

---

[4] A "transfer" is defined as "every mode, direct or indirect, absolute or conditional, or voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Utah Code § 25-6-2(12). An asset is "property of a debtor" but excludes, *inter alia*, property to the extent it is encumbered by a valid lien and property to the extent it is generally exempt under non-bankruptcy law. Utah Code § 25-6-2(2).

9

debtor's. Here, to the contrary, the avoidance claim seeks to avoid the transfer only to the extent it transferred the Debtor's equitable interest in the Property.

    B. Reasonably Equivalent Value

"Reasonably equivalent value" under the Utah statute has been described as "a price [that] a capable and diligent businessman could presently obtain for the property after conferring with those accustomed to buy such property." In re Tri-Valley Distributing, Inc., 452 B.R. 837, 846 & n.10 (Bankr. D. Utah 2011) (citing Meyer v. Gen. Am. Corp., 569 P.2d 1094, 1097 (Utah 1977)). In addition, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred. . ." In re Holling, 2007 WL 2964505, at *2 (citing Utah Code § 25–6–4(1)).

This is significant to the reasonably equivalent value analysis since while Hindin as a guarantor received a release from her guaranty obligation, the Deed in Lieu Agreement prevented inquiry into the actual loan amount, and hence foreclosed the opportunity to know if there was any value to her equity interest. (Am. Compl. ¶¶ 34-36). Although she was released from her obligations as a guarantor with the Releases, Hindin as equity holder did not necessarily receive the reasonable equivalent value of her investment. The alleged facts suggest that Defendants gave nothing of value to the Debtor in exchange for the Debtor's transfer of her equity interest in Dakota. Therefore, the Trustee has adequately alleged that the Debtor did not receive reasonably equivalent value for the transfer.

While it is unclear what the actual value of this alleged interest might be, at this point the Trustee has alleged a transfer of Hindin's interest as a member and equity holder of the entity holding a 50% interest in the entity holding a 100% interest in the Property Owner. If, as contended by Defendants, the debt owed to Goldman Sachs exceeds the value of the property,

then there will be no interest in the property that would merit avoiding the transfer. If, on the other hand, the value of the property exceeds the debt owed to Goldman, the interest Hindin holds as 50% equity holder would have at least some value. We are without this information because Goldman Sachs has only limitedly complied with the Bankruptcy Court's January 6, 2012 Order to produce core documentation that relates to the Deed in Lieu Agreement, appraisal history and basic history of the loan account. (Am. Compl. at n.2; Declaration of Ari M. Berman ("Berman Decl.") Ex. C). As noted in the Trustee's amended motion for production of documents, "[i]t is possible that the Plaintiff's investigation will reveal that the bankruptcy estate has no equity interest in the Lodge." (Berman Decl. Ex. E, at ¶ 11). But the contingencies on which such a determination relies are not dispositive on a motion to dismiss. The Trustee alleges enough to survive dismissal.

C. Insolvency

Under the UFTA, "[t]he level of insolvency necessary to meet the statute [sic] requirement is not insolvency in the bankruptcy sense but merely a showing that the party's assets are not sufficient to meet liabilities as they become due." In re Fabbro 411 B.R. 407, 423 n.44 (Bankr. D. Utah 2009) (quoting Meyer, 569 P.2d at 1096); Tolle v. Fenley, 132 P.3d 63, 69 (Utah App. Mar 02, 2006) ("[o]nly a showing that the debtor's entire nonexempt property and assets are insufficient to pay his debts rises to the level of insolvency.")

While the allegation in the complaint (Am. Compl. ¶ 30) is based only upon information and belief, the voluntary petition lists her liabilities as $11,507,375.04, compared to assets totaling only $4,186,224.90 (Opp. Ex. E, at 12 of 106). We do not know the precise value of her alleged interest in the Property, again in part because Goldman Sachs has not entirely complied with the order of the Bankruptcy Court. (Am. Compl. at n.2). But these allegations and

11

supporting documentation, taken as true, suffice to allege that Hindin was not able to meet liabilities as they became due because of the transfer of her equity interest.

D. Creditor

Lastly, to state a claim under 25-6-6, the Trustee must establish that creditors had claims before the transfer. The UFTA "broadly defines the 'creditor' to mean any person who has a claim." Tolle, 132 P.3d at 66 (quoting National Loan Investors, 952 P.2d at 1069). A "claim" is also broadly defined under the UFTA as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Id. (citing Utah Code Ann. § 25-6-2(3). The Amended Complaint proffers several creditors of the Debtor at the time the Deed in Lieu Agreement was executed. (Am. Compl. ¶ 41). Some of those creditors are also listed among the "creditors holding unsecured nonpriority claims" on her Voluntary Petition. (See Opp. Ex. E). Therefore, the Trustee adequately alleges that the Debtor had creditors with claims against her before the transfer occurred.

The Trustee states a claim under Utah Code § 25-6-6 for constructive fraudulent transfer and Defendants' motion to dismiss Claim 2 is denied.

V. 91 Day Clause as Unconscionable (Claim 4)

Defendants also seek to dismiss the claim that the 91 Day Clause is void as against public policy. Defendants contend that the 91 Day Clause is not against public policy, but even if it is, it cannot be used to void the entire Deed in Lieu Agreement.

The 91 Day Clause provides for limited release and covenant not to sue the Borrowers personally for any liability under the Loan Agreements and tentatively releases Principals from

their liabilities and obligations arising under the Guaranties. It excludes surviving liabilities from the covenant not to sue.

But these releases of liability are contingent upon an Interference Event not occurring within 91 days of the Transfer Date, i.e., the date of the Deed in Lieu Agreement. (Deed in Lieu Agreement § 5). An "Interference Event" includes the occurrence of commencement of any Voluntary Bankruptcy. (Definitions, Deed in Lieu Agreement § 1). A "Voluntary Bankruptcy" is defined as:

> [A]ny arrangement, assignment for the benefit of creditors, bankruptcy, composition, insolvency, or other debtor relief proceeding of any kind whatsoever affecting any Borrower or any Borrower Affiliate party to any Transfer Document, whether under federal or state law, commenced voluntarily by any Borrower or Borrower Affiliate or with any direct or indirect collusion, consent, facilitation, or instigation by any Borrower, any Borrower Affiliate or any Principal; provided that any such debtor relief proceeding affecting solely one or more Principals but not any Borrower or any other Borrower Affiliate shall not constitute a "Voluntary Bankruptcy" for purposes of this definition.

(Definitions, Deed in Lieu Agreement § 1).

The Original Borrowers, DDP Holdings and DDP, and the New Borrowers (by quitclaim deed conveyance), Dakota Hotel and Dakota Restaurant are defined as "Borrowers" in the Deed in Lieu Agreement. "Principal" means each Guarantor (including the Debtor) and Reza Fakhrieh. "Borrower Affiliate" is not defined.

Bankruptcy Code section 365(e) prohibits so-called ipso facto clauses, that is, termination or modification of a contract "solely because of a provision in such contract. . . that is conditioned on [*inter alia*] the insolvency or financial condition of the debtor [or] the commencement of a case under this title." 11 U.S.C. § 365(e). This protection applies only to executory contracts. See In re Saint Vincent's Catholic Medical Centers of New York, 440 B.R. 587 (Bankr. S.D.N.Y. 2010) (outstanding obligations under loan documents pursuant to which

13

creditor accelerated debt owed based on debtor's Chapter 11 filing were not so material that a breach would excuse debtor's obligation to perform were not "executory contracts" and therefore not subject to Bankruptcy Code's bar on ipso facto clauses).

Defendants first argue that this provision is not unconscionable under New York law, but the cases they cite only concern the situation of a third-party guarantor's continued liability for underlying debt. For instance, In re South Side House, LLC, 470 B.R. 659 (Bankr. E.D.N.Y. 2012) only upholds the principle that a non-debtor, third-party guarantor can still be held liable for the original debt when the debtor files for bankruptcy. This case presents a much more complex corporate relationship and Hindin was much more than just a guarantor.

For one, the trustee has alleged facts that the Debtor's relationship to the Borrower entities was so complex that a court should hesitate to conclude the straightforward guarantor relationship that Defendants urge. As discussed above, Hindin signed on behalf of the Original Borrowers as a member of Dakota and also signed as a guarantor. Moreover, on her proof of claims, Hindin lists Dakota, Duval Development LLC (a guarantying entity), DDP Holdings and DDP as "other names used by the Debtor in the last eight years" as "FDBA" (formerly doing business as) entities.

Where "an event of default based on the financial condition of a Designated Holding Company is necessarily connected both factually and contractually to the financial condition of [the non-debtor entity]," a cross-default provision is in effect an impermissible ipso facto clause that was not effective in bankruptcy so cure of any default under the provision was not required. In re Charter Comm'ns, 419 B.R. 221, 251 (Bankr. S.D.N.Y. 2009). In Charter Communications, the bankruptcy court considered the effect of a cross-default provision that made it an event of default for all but one holding company to fail to pay on the principal of a

debt exceeding $2 million, or fail to make an interest payment or cause any event of default that causes acceleration of the loan. The other holding companies filed for bankruptcy but the actual borrowing entity was still solvent. The court recognized that in light of interdependent relationship existing between companies and the "inherently suspect" nature of cross-default provision, see id. at 250, the facts of the case required a wider view of the corporate structure, see id. at 251 ("concentrating attention on a single solvent entity within the corporate structure disregards relationships within the integrated corporate enterprise") (quoting JPMorgan Chase Bank, N.A. v. Charter Comm'ns Operating, LLC, 409 B.R. 649, 658 (Bankr. S.D.N.Y. 2009). The circumstances of the case before me are not identical, but it gives reason to view the 91 Day Clause with caution in light of the complicated corporate structure in which the Debtor was involved.

Furthermore, given this complex structure, it is very possible that Hindin qualifies as a Borrower Affiliate. The fact that the term "Borrower Affiliate" is not defined in the Deed in Lieu Agreement left significant uncertainty about who could file for bankruptcy before the 91 day period had elapsed without jeopardizing the transaction. Although the 91 Day Clause ostensibly permits a voluntary bankruptcy filing if the "debtor relief proceeding affect[s] solely one or more Principals but not any Borrower or any other Borrower Affiliate," it was unclear how a person wearing multiple hats could affect the rest of the transaction.

Lastly, the Court hesitates to conclude that the Deed in Lieu Agreement only contemplated the named Borrower entities as Borrowers for the purpose of liability. That is, although the Borrowers named in the Deed in Lieu Agreement are all corporate entities (DDP Holdings, DDP, Dakota Hotel and Dakota Restaurant), in the 91 Day Clause, the Lender covenants not to sue any Borrower. . . "*personally* for any liability arising under the Loan

Documents." (Deed in Lieu Agreement § 5) (emphasis added). It further states that "each Borrower shall remain *personally* liable for. . . any Surviving Liabilities." Id. Any ambiguities in a contract should be charged against the drafter, in this case, Goldman Sachs; the Deed in Lieu Agreement presents several. Thus, at first blush, the Court believes that the 91 Day Clause could constitute an impermissible ipso facto clause that would be void under bankruptcy law. Dismissing the claim at this stage on this ground is improper.

But Defendants contend, in the alternative, that even if the 91 Day Clause is unenforceable, it does not void the entire Deed in Lieu Agreement. Rather, when a contract contains both lawful and unlawful objectives, New York courts often enforce legal components of an agreement where the "illegal aspects are incidental to the legal aspects and are not the main objective of the agreement." Kidder, Peabody & Co., Inc. v. IAG Intern. Acceptance Group N.V., 28 F. Supp. 2d 126, 139 (S.D.N.Y. 1998) (quoting Artache v. Goldin, 133 A.D.2d 596, 519 N.Y.S.2d 702, 705 (2d Dep't 1987)). Plaintiff's allegation that "[t]he 91 Day Clause was an essential and indispensable provision of the Deed in Lieu Agreement from the standpoint of the drafter of said agreement, Goldman Sachs" (Am. Compl. ¶ 49) is a legal conclusion, not a fact that must be accepted as true. Plaintiffs have failed to allege that this deed in lieu of foreclosure is somehow predicated on the release of guarantors or borrowers from their obligations.

Furthermore, as Defendants mention in passing, Claim 4 must be dismissed because the Trustee has not joined necessary parties as required by Fed. R. Civ. P. 19.[5] Namely, he has not

---

[5] Federal Rule of Civil Procedure Rule 19 provides:

A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

**(A)** in that person's absence, the court cannot accord complete relief among existing parties; or

joined the other signatories of the Deed in Lieu Agreement, whose interests may be affected by any decision concerning the Deed in Lieu Agreement or alleged any reasons why the other parties could not be joined. Therefore, Defendants' motion to dismiss Claim 4 of the Amended Complaint is granted.

However, Claim 4 is dismissed without prejudice as the Court will grant Plaintiff leave to amend its complaint for the following purposes: (1) to add any and all necessary parties and (2) to allege facts, following limited discovery, supporting the assertion that the 91 Day Clause was an essential and indispensable provision of the Deed in Lieu agreement

## CONCLUSION

Defendants' motion to dismiss the Amended Complaint (Dkt. No. 25) is GRANTED as to Claims 1, 3 and 4 and is DENIED as to Claim 2 for constructive fraudulent transfer under Utah law. The Court grants Plaintiff leave to amend Claim 4, following limited discovery, to remedy the stated deficiencies.

SO ORDERED.

Dated:      September 30, 2013
            New York, New York

ANDREW L. CARTER, JR.
United States District Judge

---

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.